IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

JACQUELINE E. V. RYAN E.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

JACQUELINE E., APPELLANT,

V.

RYAN E., APPELLEE.

Filed April 6, 2021.    No. A-20-740.

Appeal from the District Court for Douglas County: THOMAS A. OTEPKA, Judge. Affirmed.

Stephanie Weber Milone, of Milone Law Office, for appellant.

Christopher A. Vacanti and William L. Finocchiaro, of Vacanti Shattuck, for appellee.

MOORE, RIEDMANN, and BISHOP, Judges.

MOORE, Judge.

### INTRODUCTION

Jacqueline E. appeals from the order of the district court for Douglas County, denying her three applications to hold Ryan E. in contempt for failing to satisfy his obligations pursuant to the parties' divorce decree entered in 2019. On appeal, she assigns error to the court's failure to hold Ryan in contempt and to award her attorney fees. We affirm.

### STATEMENT OF FACTS

Jacqueline and Ryan were married in June 2001. They are the parents of Gavin, born in 2003; Kiersten, born in 2005; and Logan, born in 2009. The district court entered a decree dissolving the parties' marriage on May 9, 2019. The court awarded the parties joint legal and joint physical custody of the children. The decree provides for parenting time on a rotating 2-week schedule, with Ryan having the children from 9 a.m. Monday to 9 a.m. Wednesday each week, Jacqueline having the children from 9 a.m. Wednesday to 9 a.m. Friday each week, and with the

- 1 -

parties each having parenting time from 9 a.m. Friday to 9 a.m. Monday every other week. The court ordered Jacqueline to pay child support of $212 per month for three children, $194 per month for two children, and $151 for one child. The court found, based on the parties' agreement, that individual and/or family therapy was "necessary and prudent to address divorce trauma and family dysfunction" and that each member of the family should participate in some form of therapy "in furtherance of a goal to improve inter-family dynamics." Jacqueline was ordered to maintain health insurance for the minor children as long as it remained available to her through her employment at a reasonable cost. The court ordered the parties to provide clothing and shoes for the children while in that party's care and allocated all other reasonable and necessary direct expenditures for the children after January 1, 2019, with Jacqueline paying 54 percent and Ryan paying 46 percent. The parties' obligation to pay for uninsured health care costs incurred for the minor children was allocated using the same percentages. The parties negotiated a partial parenting plan outlining holiday and vacation parenting time, and various other parenting rights, responsibilities, and obligations through mediation, which was approved by the court and attached to the decree.

On March 17, 2020, Ryan filed a complaint for modification, asking the district court to award him sole legal and sole physical custody of Gavin. Ryan alleged a material change in circumstances since entry of the decree, in that Gavin's relationship with Jacqueline had deteriorated to the point where he refused to spend any time with her and Gavin had been living exclusively with Ryan since January 22. Ryan also alleged that Gavin had refused to follow Ryan's instruction that he must comply with the court ordered parenting time; that Ryan had punished Gavin for his refusal by not allowing him to spend time with friends; that Gavin preferred to accept punishment rather than subject himself "to the way he is treated by [Jacqueline]; that Ryan is unable and unwilling to physically force Gavin (who is 6 feet 1 inch tall and weighs 250 pounds) to spend parenting time with Jacqueline; and that Gavin is "of sufficient age and maturity to voice his desires regarding his custody and parenting time with each parent."

In her answer and counterclaim, Jacqueline alleged that Ryan's modification action failed to state a cause of action upon which relief could be granted and was frivolous and/or made in bad faith and/or for the purposes of harassing Jacqueline. Jacqueline asserted that due to a lengthy list of material changes in circumstances, an award of sole legal and sole physical custody to Jacqueline was in the best interests of all three children.

On May 1, 2020, Jacqueline filed the first of the three applications for an order to show cause at issue in the present appeal. In her application, Jacqueline set forth more than 25 different alleged violations of the decree, primarily relating to violations of provisions of the decree and parenting plan pertaining to custody and parenting time and the parties' rights, responsibilities, and obligations. Her numerous allegations include Ryan's failure to ensure Gavin's compliance with the specified parenting time provisions, allowing Kiersten "to adopt a similar stance," failure to allow Jacqueline's Easter parenting time in 2020, certain refusals relating to health care and therapy, and the withdrawal of funds from a financial account of one of the children. The district court entered an order to show cause.

On June 5, 2020, Jacqueline filed her second contempt application, alleging that Ryan had violated the decree by denying Jacqueline her Mother's Day parenting time with the children. The district court entered a show cause order on June 8.

On June 29, 2020, Ryan filed an amended complaint for modification, seeking sole legal and sole physical custody of all three children. In addition to the material changes in circumstances previously alleged with respect to Gavin, Ryan alleged that Kiersten's relationship with Jacqueline had deteriorated to the point where she refused to spend any time with her. Ryan alleged that Kiersten had expressed concerns about Jacqueline's new boyfriend, the "liveable condition" of Jacqueline's residence, and Jacqueline's behavior toward her. Ryan also detailed Kiersten's discovery of a handgun on the counter in Jacqueline's home in March 2020, which was photographed by Kiersten and which Jacqueline had not acknowledged or explained despite inquiries by both Ryan and his attorney. Finally, Ryan alleged that Kiersten was of sufficient age and maturity to voice her desires regarding custody and parenting time with each parent and that Logan was of sufficient age and maturity to give evidence about Jacqueline's parenting and the condition of her residence.

In her answer to the amended complaint and counterclaim, Jacqueline denied the material changes in circumstances alleged by Ryan, and she again sought sole legal and sole physical custody of the children.

Jacqueline filed her third contempt application on July 20, 2020, alleging that Ryan had violated the decree by denying Jacqueline her July 4th holiday and her summer vacation parenting time with the children. She also alleged that she had not had parenting time with any of the children "in several months." The district court entered a show cause order on July 21.

The district court heard all three of Jacqueline's contempt applications on August 27, 2020. Both parties testified, and the court also heard testimony from Gavin and Kiersten in chambers with legal counsel present. The court received exhibits including certain pleadings, attorney fee affidavits from Jacqueline's attorney, copies of certain email and text message correspondence between the parties, and email attachments including a bank statement and a photograph of the handgun on Jacqueline's kitchen counter.

The record shows that Gavin has stayed full time at Ryan's residence since sometime in January 2020 (except for 4 days in March); Kiersten has stayed full time at Ryan's since April 1; and Logan has stayed full time at Ryan's since a couple of days after Kiersten began doing so. Prior to those times, the parenting plan set forth in the decree was followed for each child. According to Jacqueline, she had missed 98 days of parenting time with Gavin, 70 days with Kiersten, and 68 days with Logan at the time of the contempt hearing.

When asked why he began residing full time with Ryan, Gavin testified that he was frustrated with the way Jacqueline treated him, that he felt more comfortable at Ryan's house, and that staying with Ryan was "just better for [him] mentally." When he returned to Jacqueline's residence for 4 days of her parenting time in March 2020, he experienced "the same issues and problems" as before. Gavin was asked about the nature of the issues between him and Jacqueline and testified that she was "really micromanaging," "controlling of what [he] [does] in [his] time," and that as he matured, she "treated [him] like a child." Gavin testified that when addressing the issues he has with Jacqueline, the situation sometimes would "escalate" to the point of yelling and screaming.

Gavin testified that he has tried to talk to Jacqueline about how he wants to be treated and noted that he was also able to voice his opinion on these matters when he and his siblings had family therapy with Jacqueline. He felt like the therapy was somewhat helpful, but he testified that

"it's a lot easier . . . in therapy to say you're gonna fix your problems and . . . say you're gonna do stuff and then it's easy to not . . . go through with it 100%."

According to Gavin, Ryan has told him he needs to go to Jacqueline's house for her parenting time. Gavin expressed that he felt "confident enough in [his] own decision" to choose what is best for himself, which he feels is "living at [his] dad's house." He agreed that Ryan has told him that he is old enough to decide "things like this." When asked to explain further, Gavin testified that Ryan has told him he needed to be at Jacqueline's house on her days because "that's what the decree says" but that Ryan cannot force him to go. Gavin also confirmed that Ryan has "once or twice" taken the children to Jacqueline's house and dropped them off for parenting time despite their preference not to go. On at least one of those occasions, the children simply walked back to Ryan's house after he dropped them off; they spoke with Jacqueline, but did not go into her residence. We note that the parties live only two blocks apart. Ryan did not return the children to Jacqueline's upon finding that they had returned to his house.

Kiersten also testified about what led her to begin staying full time at Ryan's house. According to Kiersten, in February or March 2020, Jacqueline started bringing friends over to her house, and at some point, Jacqueline introduced the children to her boyfriend, Jason. Kiersten stated that she "never really got close" with Jason because he came over about once a week, and they did not talk much. She also testified that "it was always uncomfortable around Jason" because she did not know anything about him other than his name.

Kiersten testified that a couple days before April 1, 2020, while Jacqueline and Jason were out of the house, she went into the kitchen and found a gun on the counter on a bag. Kiersten stated that she was "really confused" upon seeing the gun as "[they are] not . . . a gun family," Ryan had never kept guns in the house, and Jacqueline had never told her anything about Jason having a gun. When Kiersten came back from a walk and found the gun, Logan was home alone in the living room, which is connected to the kitchen. Kiersten testified that the gun "freaked [her] out a lot." Kiersten testified that she "really didn't know what to do at first" as she processed the situation, especially given her discomfort around and lack of knowledge about Jason. She ended up taking a picture of the gun and did not discuss it with Jacqueline at that time because she "didn't know what to do yet" and "didn't feel safe at that time." Kiersten repeated later in her testimony that the gun was not in the bag, but she acknowledged moving it "not even a foot over to take the photo so the stuff isn't in the background," after which she returned it to its original location. After returning to Ryan's residence, Kiersten showed Ryan the picture of the gun, and he sent Jacqueline an email about the gun so Kiersten would not have to initiate a discussion about it with Jacqueline.

According to Kiersten, when she next returned to Jacqueline's residence for parenting time, Jacqueline took her phone away, started yelling at her without explanation, told her she "ruined everything in her life," and asked how it felt "to have [her] privacy invaded." She testified that Jacqueline inquired, "why did you take a picture of it," and told Kiersten it was her fault for finding the gun and telling Ryan about it. Kiersten stated she went into her bathroom and locked the door because Jacqueline would not stop screaming at her. Kiersten tried to contact Ryan on an old cell phone she had because she "felt scared of [her] mom," but Jacqueline had unplugged the Wi-Fi and the home phone. Kiersten testified that when she tried to leave the residence, Jacqueline blocked the door by standing in front of it and threatened to call the police. Kiersten eventually left through the garage, went to a neighbor's house, and the neighbor took her to Ryan's house.

Subsequently, the police showed up at Ryan's house after Jacqueline contacted them stating Kiersten had left her house without permission.

Kiersten testified that when she went to Jacqueline's house after discovering the gun, she knew Jacqueline would want to talk about it. During the anticipated conversation, Kiersten "was gonna ask for two things." She testified:

> I wanted . . . an explanation why the gun was left there 'cause . . . I was honestly most scared for Logan just 'cause he's so young and we're not . . . a gun household, so we don't know -- he doesn't know about all those things. So I was gonna ask her why the gun was there and why she never told us about it.

Since the gun incident, Kiersten has not gone back to spend the night with Jacqueline, testifying that when she does go, she goes with a friend because she does not want to be there alone. Kiersten testified that her mother has never addressed the gun with her and continues to deny the gun was there, despite the picture of the gun that was emailed to her. A copy of the picture attached to Ryan's email inquiry of March 30, 2020 was admitted into evidence, and Jacqueline acknowledged during her testimony on cross-examination to having received the email and that the counter depicted in the photo looks like her counter. Kiersten testified that Jacqueline has told her multiple different stories regarding the gun ("there was no gun," "it wasn't Jason's gun," "he said he didn't bring it"), but she has never admitted there was a gun.

Kiersten testified briefly about Gavin's and Logan's relationships with Jacqueline. Kiersten testified that Logan also felt unsafe after the gun incident. She indicated that yelling is a regular thing at Jacqueline's residence. Kiersten recalled instances of Jacqueline yelling at Gavin, and testified that in the past, she had slept in the closet in order to not hear Jacqueline yelling. Kiersten's testimony about the effects of therapy on the relationship between herself and Jacqueline was similar to Gavin's. Kiersten testified that "whenever [Jacqueline] would come home, she would not work on the things that the therapist told her to work on" and that Jacqueline's "yelling" continued.

Jacqueline's rendition of the gun incident differed from Kiersten's. Jacqueline testified that on April 1st, she came home from work and found out that Kiersten "had been snooping and going through people's property." According to Jacqueline, she told Kiersten that they needed to talk and that she confiscated Kiersten's phone when she refused to talk. She acknowledged that she "turned the Internet off" because Kiersten's old phone "was on the Internet." Jacqueline testified that she also received an email from Ryan "demanding that Kiersten get her cell phone back because if the cell phones are taken away, the other parent is supposed to be notified." According to Jacqueline, she "hadn't grounded [Kiersten] from it," but was just trying to get Kiersten's attention. She testified that Kiersten would not talk to her, walked out the door, and went to a neighbor's house.

Jacqueline testified that she and Ryan exchanged multiple emails about the gun incident, testifying that "they're lies and he was just demanding me to admit things that weren't true." She also testified, "And he just said, Kiersten's not coming back until you address those issues. And they were addressed with [Jacqueline's attorney] and [Jacqueline's attorney] addressed them with his attorney." When asked if one of "those issues" involved a gun, Jacqueline agreed, testifying, "Apparently. I didn't see the gun, but apparently [Kiersten] found a gun and photographed it."

Jacqueline testified that in addition to addressing the issue of the gun through her attorney, she called the police "when the kids wouldn't come back," and the police advised her she was allowed to have a gun in her house and that "that's not a reason for [her] kids not to be with [her]."

As noted above, Jacqueline acknowledged having received the email from Ryan with a picture of the gun on March 30, 2020, and that her response was made through her attorney. She further acknowledged that her attorney's response to Ryan's attorney was that there was not a gun on the kitchen counter. When asked whether she had ever provided "an explanation to date as to why there was a gun left out at her house," she testified, "There was never a gun left out at my house. I have never seen that gun before." Jacqueline also testified that it had been explained in interrogatories that "there was never a gun laying out in the open on the kitchen counter."

When asked to acknowledge that there was a gun in the house, Jacqueline testified that she did not know about it at the time and that her first notification that there was a gun occurred when she received the emailed picture. Jacqueline then testified that the gun belonged to Jason, who did bring the gun to the house, but that it was "stowed away in his belongings," and that it was not exposed and visible on the counter. She testified that if the gun had been out on her counter, she and Logan would have seen it. Jacqueline was asked, based on this explanation in her testimony, why she did not provide Ryan with a similar explanation "from the beginning." Jacqueline replied, "I think I said there was no gun, there was never a gun." Jacqueline then testified to her belief that Ryan and Kiersten "conspired," that Ryan "told [Kiersten] to go through Jason's things," and that upon finding the gun, it was "a big plan to take pictures of it." She also stated that Kiersten "went through" Jason's wallet and later "bragged about how she picked [the gun] up and held it in her hand."

Jacqueline testified about Gavin's decision to stop attending her parenting time. She described her decision to not allow him to have friends spend the night on the Sunday of Martin Luther King Day weekend because she had to work the next day. According to Jacqueline, she was woken by "some kids walking through the snow sneaking into [her] basement." Jacqueline testified that they left after she told them "very politely" that Gavin did not have permission for them to be there, stating that "[t]here was no scene, there was no yelling." According to Jacqueline, Gavin decided to stop coming to her house after this incident. She also described Gavin's return in March 2020, which occurred during "the middle of Covid or after spring break where they had virtual classes and he skipped class Tuesday." She testified that Gavin left her residence again because she "took his Xbox" away as a consequence of skipping school. According to Jacqueline, when she tried to discuss the issue with Ryan, he said that Gavin was old enough to make up his mind, it was Jacqueline's fault she did not have a relationship with her children, and he was not able to force them to see her.

Jacqueline also testified about other issues raised in her applications for contempt, testifying generally to not being allowed to make decisions for the children or being informed about them, in addition to not being able to see them. She testified to learning after the fact that Kiersten had a job at a fast food restaurant, arriving at sports events for the children to discover that they were not there, not being informed in advance of the children missing school or about missing homework assignments, and not being apprised of their medical appointments or other decisions relating to the children's lives. She also testified that Ryan has not provided information to her prior to traveling out of town with the children. Jacqueline testified that Gavin's performance

in school has declined since living full time with Ryan. According to Jacqueline, Ryan's response to her inquiries as to at least some of these matters is "why don't you address the gun." She made it clear that the parties do not communicate well. She testified that the children's behaviors had not changed in a good way since residing full time with Ryan, and she also expressed concern about the "inappropriate" subject matter of some videos Gavin and Kiersten have posted on social media.

Jacqueline testified about not receiving holiday parenting time at Easter, Mother's Day, and on July 4 in 2020, as well as her summer vacation parenting time. According to Jacqueline, she heard a noise outside on July 4, and saw the children walking down her driveway toward Ryan's house. Jacqueline testified that Ryan notified her about an hour later that they were at his house, having returned after he dropped them off at her house, and blaming her for the children not wanting to be with her. In his testimony, Gavin confirmed that he spent Mother's Day in Kansas City with friends and that he was at Ryan's house and "had friends over" on July 4. He did not specifically recall any incident with his mother on July 4, and testified that "she usually wasn't big into . . . fireworks, I guess."

With respect to therapy, Jacqueline agreed that Ryan participated in three family therapy sessions, but she testified that the process was complicated by Gavin not attending his individual sessions that were to occur in between the family sessions and the parties' disputes with respect to payment of the co-pay. Therapy was not ongoing at the time of trial.

Jacqueline testified about $25 that was withdrawn from an account of Gavin's that was not discussed with her. She also testified that she found out from one of her neighbors that Gavin had a grocery store job, which was not discussed with her, that Ryan had opened different accounts for the children so that she did not have access to them, and that she had "no knowledge of how much money [Gavin's] making or what's going on there." A copy of a statement from Gavin's account was received into evidence. The statement shows a withdrawal of $25 and includes a notation of "check deposited returned." Jacqueline testified that she did not know anything specific other than the fact that the balance in the account declined by $25.

Copies of Jacqueline's applications for contempt were received into evidence, and she testified that the statements in all three applications were true.

Ryan's testimony at the contempt hearing was brief. He testified about the issues that caused both Gavin and Kiersten to begin living with him full time. According to Ryan, Gavin was not happy staying with Jacqueline and is "tired of getting bullied and controlled by his mother." Ryan stated that he has talked to Gavin about his responsibility to continue a relationship with Jacqueline. He testified that he has told Gavin on numerous occasions he has to be with Jacqueline during her parenting time and that he has neither discouraged Gavin from seeing Jacqueline nor encouraged Gavin to stay with him. Ryan and Gavin have discussed Gavin's feelings of being "very unhappy" at Jacqueline's house. Ryan affirmed that he was torn between taking care of his son and following the court order. With respect to his efforts to obtain an explanation from Jacqueline about the gun issue, Ryan testified that he has asked her about the gun between 25 and 30 times and that he was alarmed when he was told there was no gun.

Ryan was asked about Jacqueline's testimony that he was not communicating with her about health care decisions. Ryan testified that after Jacqueline became unemployed in 2020, the children no longer had health insurance and that he eventually obtained coverage for the children.

As to communication about other decisions involving the children, Ryan indicated that "for the most part she is notified by the hospital when the kids have appointments." Ryan also testified that he participated in family therapy as required. He denied disallowing Gavin from attending therapy as well as removing any money from Gavin's account. Finally, he testified to his belief that it was in the children's best interests to remain in his care based on "not knowing the gun situation in the home."

On September 15, 2020, the district court entered an order, finding that Jacqueline failed to meet her burden of proof by clear and convincing evidence that Ryan willfully and contumaciously violated the decree. Accordingly, the court dismissed Jacqueline's applications for contempt and vacated the show cause orders. In analyzing the evidence, the court reviewed certain Nebraska case law and found that Ryan was faced with "court ordered parenting time for Jacqueline and children with emotional issues." The court discussed the deterioration of Jacqueline's relationships with both Gavin and Kiersten, including the discovery of the gun, and noted that when Ryan asked Jacqueline to explain the presence of a gun on her kitchen counter, "she insisted there was no gun and that remains her answer to this date." The court was unable to find "that Ryan showed a consistent pattern of transferring his responsibility to Gavin or Kiersten and Logan for parenting time with Jacqueline." The court noted Ryan's testimony that he repeatedly told Gavin he needed to maintain a relationship with his mother and follow the decree, notwithstanding the emotional issues between the two of them. Finally, the court stated, "The gun discovery at Jacqueline's by Kiersten at the end of March 2020, which Jacqueline denies notwithstanding the photo, certainly requires the [c]ourt to weigh credibility."

Jacqueline subsequently perfected her appeal to this court.

ASSIGNMENTS OF ERROR

Jacqueline asserts that the district court erred in (1) denying her three separate contempt applications and (2) failing to award her attorney fees.

STANDARD OF REVIEW

In a civil contempt proceeding where a party seeks remedial relief for an alleged violation of a court order, an appellate court employs a three-part standard of review in which (1) the trial court's resolution of issues of law is reviewed de novo, (2) the trial court's factual findings are reviewed for clear error, and (3) the trial court's determinations of whether a party is in contempt and of the sanction to be imposed are reviewed for abuse of discretion. *Yori v. Helms*, 307 Neb. 375, 949 N.W.2d 325 (2020). A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrain from acting, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Krejci v. Krejci*, 304 Neb. 302, 934 N.W.2d 179 (2019).

Costs, including reasonable attorney fees, can be awarded in a contempt proceeding. *McCullough v. McCullough*, 299 Neb. 719, 910 N.W.2d 515 (2018). When an attorney fee is authorized, the amount of the fee is addressed to the trial court's discretion, and its ruling will not be disturbed on appeal absent an abuse of discretion. *Patera v. Patera*, 24 Neb. App. 425, 889 N.W.2d 624 (2017).

## ANALYSIS

*Failure to Find Ryan in Contempt of Court.*

Jacqueline asserts that the district court erred in denying her three separate contempt applications.

Civil contempt proceedings are instituted to preserve and enforce the rights of private parties to a suit when a party fails to comply with a court order made for the benefit of the opposing party. *Krejci v. Krejci, supra*. Willful disobedience is an essential element of contempt; "willful" means the violation was committed intentionally, with knowledge that the act violated the court order. *Id.* Outside of statutory procedures imposing a different standard or an evidentiary presumption, all elements of contempt must be proved by the complainant by clear and convincing evidence. *Id.* If it is impossible to comply with the order of the court, the failure to comply is not willful. *McCullough v. McCullough, supr*a. Willfulness is a factual determination to be reviewed for clear error. *Id.*

The Nebraska Supreme Court has declined to endorse a proposition that "the responsibility for adhering to a visitation plan devolves to the children." *Krejci v. Krejci*, 304 Neb. at 308, 934 N.W.2d at 184. It has also stated its awareness that "a parent may use a child's hesitation to visit a noncustodial person as a subterfuge for contumaciously interfering with the visitation." 304 Neb. at 308, 934 N.W.2d at 184. However, the Supreme Court has also observed that a "singular event," which is not in accordance with a court decree, may be defensible. *Martin v. Martin*, 294 Neb. 106, 119, 881 N.W.2d 174, 183 (2016).

*Martin* was one of the cases referenced by the district court in its analysis. In that case, the Nebraska Supreme Court affirmed a trial court's finding of willful contempt where there was a consistent pattern of the mother transferring her responsibility to the children. The Supreme Court found no abuse of discretion in the contempt finding in light of the mother's continued behavior combined with evidence that the father was unable to exercise his court-ordered parenting time. See *id.* The district court in the present case, also discussed an unpublished case, *Samp v. Samp*, No. A-17-810, 2018 WL 3387581 (Neb. App. July 2, 2018). In *Samp*, we affirmed the trial court's finding that a parent was not in willful contempt where the mother's decisions with regard to parenting time reflected both the child's preference and a concern over the child's mental state and well-being. There was evidence that the mother consistently encouraged the child to participate in parenting time, that it was important for the child to have a good relationship with the father, and the mother encouraged counseling sessions between the father and child. The record also showed that the trial court gave greater weight to the mother's evidence and testimony.

Here, the district court found that, as in *Samp*, Ryan was faced with court-ordered parenting time for Jacqueline and children with emotional issues. The court noted the deterioration of Jacqueline's relationship with both Gavin and Kiersten and her continued insistence that there was no gun on the counter. Unlike the situation in *Martin*, the court in this case was unable to find that Ryan showed a consistent pattern of transferring his responsibility to the children, noting testimony that Ryan repeatedly told Gavin he needed to maintain a relationship with Jacqueline and follow the court-ordered parenting time plan, notwithstanding the emotional issues between them. The court also stated that the evidence with respect to the gun required it to "weigh credibility." The

court then concluded that Jacqueline failed to meet her burden of proving by clear and convincing evidence that Ryan willfully and contumaciously violated the decree.

We agree that the situation presented here is more like that presented in *Samp*. Ryan was faced with children who were reluctant to attend parenting time and whose relationship with their mother had deteriorated. He was also faced with Kiersten's distress over the discovery of the handgun and Jacqueline's lack of, or inconsistent, explanation. The evidence shows that Ryan stressed the importance of attending parenting time to Gavin, although he also apparently made it clear that he could not force Gavin to attend. Ryan did make some attempts to take the children directly to Jacqueline's house, but they simply returned home.

It is clear that the parties have a strained relationship and do not communicate well, but the record is not devoid of communication on issues raised by Jacqueline in her contempt applications. Rather, it reflects that not all communications about parenting matters occurred in the time and fashion desired by Jacqueline. The district court heard evidence on the issues raised in Jacqueline's contempt applications. In finding that Jacqueline did not carry her burden to establish Ryan was in willful and contumacious contempt of an order of the court, the court clearly gave greater weight to Ryan's evidence and, in particular, questioned the credibility of Jacqueline's evidence with respect to the handgun. See *Yori v. Helms*, 307 Neb. 375, 949 N.W.2d 325 (2020) (where credible evidence is in conflict on material issue of fact, appellate court considers, and may give weight to, fact that trial court heard and observed witnesses and accepted one version of facts rather than another). Accordingly, we find no clear error in the court's factual findings with respect to whether any violation of the decree and parenting plan by Ryan was willful. The court did not abuse its discretion in failing to find Ryan in contempt of court.

*Failure to Award Attorney Fees.*

Jacqueline asserts that upon this court finding the district court erred in failing to find Ryan in contempt, attorney fees should have been awarded to her. Given our resolution of her first assignment of error, we need not address this assignment of error further. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it. *Brumbaugh v. Bendorf*, 306 Neb. 250, 945 N.W.2d 116 (2020).

CONCLUSION

The district court did not abuse its discretion in failing to find Ryan in contempt of court or in denying her request for attorney fees.

AFFIRMED.

- 10 -